Good morning, Your Honors. My name is Gilbert Fontenot. I'm the attorney for Barcliff, LLC, doing business as Radcliffe Economy Marine, who I refer to as Radcliffe. Prior to November of 2014, U.S. physical suppliers of bunker fuel to foreign vessels would rely on the Federal Maritime Lien Act as security when they extended credit to these foreign vessels coming to the U.S. ports. It would allow them to provide fuel with very little paperwork, actually no paperwork. In return, they could rely on the security of the worth of the 42A sets out the requirement, and it's simply a person providing necessaries to a vessel on the order of the owner or a person authorized by the owner has a maritime lien on the vessel. The simplicity... Isn't that the issue? And that is whether or not your client provided the marine fuel on the order of the owner or person authorized by the owner. That's exactly it. That's this whole case right there, that statute. And didn't you, in the agreed facts, say that TECNIP didn't grant Bunker, U.K. the authority to act as its agent or to bind it? We did not admit agency in the undisputed facts. The undisputed facts were that we were a subcontractor to the other intermediaries in the chain of this order. But you did agree, though, that you're not a broker. They, my client... W.U.K. was not a broker. Correct. My client and his practice thought, you know, viewed them as a broker, but I would think under law, they're not a broker. And he testified to that. The judge said they were not. But... And TECNIP had the contract with O.W.U.K., not with your client. Correct. But the contract between TECNIP and O.W.U.K. was simply a confirmation order that was exchanged between those two parties. And in that confirmation order, it lists, or excuse me, it states that the actual physical supplier is going to be Radcliffe Economy Marine. What happens then is O.W.U.K. then apparently contracted with an affiliate of theirs, their companies, O.W.U.S.A., who then contact Radcliffe to fill this fuel order. But O.W.U.K., O.W.U.S.A., they never appeared on site or participated in this fueling. This is the slimmest of contracts imaginable. It's simply an exchange of two pieces of paper between those parties and the owner. But counsel, it wasn't that potentially intentional in the reason that this whole relationship was set up with the series of subcontracts so that there wouldn't be this direct relationship between, you know, the person providing the fuel and the owner of the fuel. And certainly, your client could have insisted upon some sort of direct kind of line drawn from them and the owner of the company. And that was just a risk that was part of doing business in this fashion. Well, there are several things there. I don't know if it's intentional where it was set up that they had this sort of, you know, breaking the chain of agency. That's what has happened. But this is the way, apparently, this has been done for a long time, when you have these foreign vessels using foreign brokers or resellers or independent contractors, not in the U.S., such as O.W. Bunker's U.K., where they use that entity. They don't go looking, these big shipping conglomerates, don't go looking for the local supplier. They use international agencies, such as O.W. Bunker's U.K., who then uses the local O.W. Bunker's U.S.A., who knows the local suppliers. And that had occurred here since 2001 in the Port of Mobile. This is not a one and done where they just contact a raffle, they didn't know each other. This has been going on for many, many years with these same parties in the same boats. And what difference does that make? Well, and that kind of jumps into this issue of whether or not, as a subcontractor, Radcliffe was sufficiently well known enough to the owner, TechNIP, that you could say it had a maritime lien. And this is the Gale Head and Stephen Technical Services and Marine Coding cases. Let's talk about that for a minute. The red brief says you didn't mention this argument at any time, that you argued ratification throughout the case and that you did not make this argument before the district court and you're making it for the first time on appeal. Well, I somewhat disagree with their characterization of that. Okay. I consistently argue the same facts that are used in those cases. Counsel, I've read the amended brief in support of summary judgment and you argue ratification. You don't mention no discussion of significant and ongoing involvement. Then I've looked at the revised pretrial order and I've read the whole thing. There's nothing in this regarding disputed facts, your claims. There's nothing in there regarding this argument that you're making now. And it sounded like you were setting up the facts to make when you started your argument. And that is significant and ongoing involvement, which is the term that you find in the case as an exception. And then I read the trial transcript and I don't see the argument there. Your Honor, the elements of the Eleventh Circuit case law, I've consistently argued those. What I did not do, and it's clearly on me, I did not use those terms of factor-oriented or totality of the circumstances. But those same elements of ratification and those same arguments I've made about Gail that there has been an ongoing systematic relationship. Putting forward the facts in support of another theory doesn't preserve a different theory. That's the thing. You can raise new arguments in support of a theory that you argued to the district court. The justification for us reaching that is, well, the theory was there. If somebody overlooked a decision or somebody overlooked another syllogism in support of that theory, at least the district court had a shot at it. But where you don't say, even if you don't buy theory A, here's theory B, that's kind of different. And I understand you, and correct me if I'm wrong, to say I put the facts out there that would have supported this theory even though I didn't identify it as a different theory. Is that correct? That's correct. But I would also note to the Court that this is an extremely important case, not just for me. There's 60, 50 other cases similar to this pending around the United States. And I think the issues here are important enough that this oversight of mine, and like I said, it's on me, can be excused under the standards set by this Court. Counsel, if there is no agency, do you lose on the maritime lien issue? No. And that's what I've consistently argued about the Ken Luckey case and the reading of the statute. What happened here factually? The problem with Ken Luckey is that the contracted directly with the supplier-making agency, really irrelevant. No, I don't think that's correct, Your Honor. I think the owner, well, the vessel was chartered out to Oakforts, who had a managing agent, Eurostem. And Eurostem then contacted Brooks, which was another supplier who in turn contracted with Gray Bunkering. Gray in turn contracted with Marine Fuel. What happened there is you don't have this issue of agency. No, there was no agency between Gray Bunkering and Marine Fuel. Well, you would agree if the vessel contracted directly with the supplier, it would be a different case. Marine Fuel, the one at the end? Sure. I agree. I agree. Can you tell me how the district court erred in not following a Ninth Circuit case? Well, I think it misconstrued that case because my understanding, my reading of that case . . . Did they need, did the district court need to follow a Ninth Circuit case? No, it's persuasive. It's not binding, Your Honor. But I think it's persuasive enough that they should have followed that when they're looking as opposed to Lake Charles Stevens down in the Fifth Circuit, which clearly doesn't apply to the scenario. But the Ken Luckey case closely mirrors the facts here. What you have here is a person, Radcliffe, providing necessaries fuel to a vessel, the Deep Blue, on the order of the owner, Technep. We clearly meet that. It's when you start to try to pull these intermediaries into the mix and evaluate what the relationship is that that mandate on the statute seems to fall apart. That's what occurred here. What happened in the case below is the judge expressly held that Radcliffe failed to meet his burden to prove agency under the statute. There is no requirement of agency under the statute. It's crystal clear that you don't have to have privity. You don't have to have a direct contract. There doesn't have to be a writing between these parties. It's simply a person providing necessaries to a vessel on the And the Ken Luckey case tracks that and despite these intermediaries being involved. And if I can quote for just real quick, Ken Luckey, the court says, and it's clear that Eurostem as managing agent for Belkforts did order the fuel. And it's also clear that Marine Fuel delivered the fuel to the vessel. Section 971 states that any person furnishing supplies or other necessaries to a vessel upon the order of a person authorized to bind the vessel shall be entitled to a link. That's the exact scenario that we have in this transaction, this fuel in between Technip and Radcliffe. I think another factual or misinterpretation of the Ken Luckey case is the, by the district court below, is overemphasis on this omission of authorization by Belkforts as to the ordering of the actual facts. There was no agency proof between the last few rungs of the ladder with gray bunkering and Marine Fuel. That rungs of the ladder test, which is what, it's not a test, it's something that was created by the district court below, that doesn't exist. But it failed in Ken Luckey, but the court below held that we need to jump through each of these rungs of the ladder and prove agency. That's just simply not required under the statute. These sort of judicial appendages just don't exist on the clear reading of it. Okay, counsel, we'll give you two minutes in reply and we'll hear now from Mr. Paulson. Thank you very much and good morning. Bruce Paulson for ING Bank. With apologies, I have a bit of a cold. It's going around. Mr. Fontenot talked about brokerage agency. It was admitted that there was no agency relationship here. It was stipulated in the pretrial order that this was a subcontractor situation where Radcliffe was a subcontractor down the chain and never took an order from an owner, TECNIP, or anybody authorized by the owner. The fact that there was a sales order confirmation, purchase confirmation, all the way down the chain, these are contracts of purchase and sale down the chain. Mr. Fontenot described it as an exchange of papers, but in fact, it's a situation where each and every party, OWUK, is on risk as a seller to TECNIP. OWUK is on risk as a buyer from OWUSA, so on and so forth down the line. All the way down the line, Radcliffe is a seller to OWUSA. That's its customer. The fact that it was familiar with it, in fact, cuts against the situation here. They knew OWUSA. They relied on the credit of OWUSA. They extended credit to OWUSA, but never made a claim in OWUSA's bankruptcy, where there have been robust recoveries for creditors. This is a situation where the sale was made within 20 days of the bankruptcy filing in Connecticut, and Radcliffe, instead of making a claim or even an administrative claim in that bankruptcy for 20-day goods, instead is relying on a maritime lien claim where they say, well, we're entitled to rely on the credit of the vessel. But the law says the statute is clear, and this court in Crimson Yachts made it clear that we rely on the literal language of the statute, on the order of the owner or a person authorized by the owner. That simply didn't happen here. There's a list in the statute under Section 31341 listing those presumed to have authority. In a situation such as this one, Radcliffe took an order from a buyer of fuel. It is not anybody listed in that statute as having authority to purchase fuel for the vessel. So what courts have done, and Lake Charles Sevidore's, yes, it's a Fifth Circuit case, but it follows Atlantic and Gulf and the tests in there, which is not a totality of the circumstances test, but it tests under the statute. But the courts have pondered, what do we do when we don't have the order emanating from somebody with authority as here? And so whether or not Radcliffe has waived its arguments under Stevens and Marine Codings, it still can't meet those tests. Those are different cases. Those are repair cases where there was a significant and ongoing months-long relationship between the subcontractor, in that is a case where they're a seller, OWUSA, a bankrupt counterparty, and it's too bad that parties go bankrupt and there are consequences, but that's what happened here. OW went bust overnight and their creditors worldwide, including our client who loaned $647 million to the OW entities having provided their working capital. But in any event, what Radcliffe did here was deliver a product. It's perhaps a more complicated delivery than Amazon.com dropping a box on your doorstep, but it is a few hours... I think that's getting more complicated. That's true. Now they're going to have your keys. But in any event, it is factually extremely distinguishable from Stevens and Marine Codings where the government had offices there, where the subcontractor were inspected, improved... Counsel, there was a lot of reliance on this Ken Luckey case in terms of the argument from opposing counsel. And if you would just address, I guess, whether or not you're distinguishing Ken Luckey or saying that that is a different standard that should not be adopted by this court. Ken Luckey is right in line with the rest of the cases, if you read it correctly. If you read Ken Luckey as taking the agency requirement and the statute is couched in the language of agency on the person authorized by the owner. But what Radcliffe is essentially arguing is that Ken Luckey got rid of the agency requirement. Mr. Fahn, I'll quote it from Ken Luckey and I'll do the same. One thing that's a little confusing is that this physical supplier's name is Marine Fuels. So the parties agree that the order originated from Bulkforts. Bulkforts was a subcharter, a person with authority under the statute. Thus, we need not reach the question of whether the district court's conclusion that Brooke, an intermediary, was not Bulkforts agent is erroneous because, and this is the most important word in the case, because appellees have already admitted that the fuel and bunkers were sold to Bulkforts. The court went on to say, we conclude that Marine Fuels need not establish agency between Brooke and Bulkforts to fall within the scope of one entitled to a maritime lien under the act. And they didn't have to prove it because it was admitted their direct relationship between Marine Fuels, the seller, and Bulkforts, a person with authority, was established. Therefore, agency need not be proved. The court was not saying that the agency requirement was thrown out the window. So you can't read the case the way Mr. Fontenot suggests. Judge, Magistrate Judge Cassidy below correctly found the admission to be the, quote, linchpin of the case. So Ken Luckey is in line with the rest of the cases around the country that have construed the situation where you have a chain of suppliers, say in Gale Head here, where you have a chain of suppliers of bunkers. The delivery cases, the repair cases are distinguishable. Gale Head is the case that we need to look to here. And that shows that ING, as the assignee of OWK, is the party that holds the lien in this case. Gale Head involved three different chains of brokers. Two didn't have a lien. That's where there was no relationship with the owner. And in the third, the lien or polygon who had assigned its lien to Gale Head did have a lien because it was in relationship with the owner. And so even though Lake Charles is a Fifth Circuit case and not applicable here, it collects cases and discusses, you know, the situation where a provider of necessaries, as here, sells to someone other than the owner, to not a person that's presumed to have authority under the Act. Ken Luckey is distinguishable. Gale Head is the case that matters here. And under that case, OWK has a lien. And under Section 2.3 of the credit agreement, ING is the assignee of that lien and entitled to collect in this matter. Anything else, counsel? No, thank you, Your Honor. We have your argument now. We'll hear from Mr. Baldwin. Good morning, Your Honor. Your Honor, it's Will Baldwin on behalf of the Deep Blue, one of the appellees in this case. And Mr. Paulson has covered a lot of what I would otherwise cover, so I'll try to be brief and not repeat what Mr. Paulson has said. I know I've limited time, but I do think it's important to start with the proper statutory construction for the Lien Act, especially the provisions that we're looking at here with respect to the third requirement, whether it was fuel that was provided on the order of the owner or party authorized by the owner. And the courts have said since Piedmont, which is cited in ING's brief 1920 Supreme Court case, that it's strictly construed. And the reason is simple, is because maritime liens are a special creature. They're silent by nature, and they can be enforced without even any recordation or perfection with respect to filing anything other than the simple arrest. And to allow a liberal view or a broad view, as espoused by Mr. Fontenot, would be a problem for international commerce. And that's what the cases say. And that's what's been followed recently in the 11th Circuit cases of Sweet Pea Marine and the container applications international case that they also cite therein. And when you use that framework and you look at what the district court did here, it is Technique's position as the owner of the Deep Blue that absolutely the district court applied the correct standard. The evidence is primarily undisputed with respect to what happened at the district court case. And I think it's important to highlight to the point of the panel that there were agreed facts in the pretrial order that were submitted by the parties. And I of the revised pretrial order, which was REC 79 in the lower court, there are undisputed facts that Technique did not grant OW Bunkers UK the authority to act as Technique's agent, and that Technique did not enter into any agency or brokerage agreement. Those are dispositive facts, and they're not even challenged on appeal. In addition, at every single layer of this supply chain, Technique to OW Bunkers UK, OW Bunkers UK to OW USA, and then OW USA to Radcliffe, there's a separate contractual relationship. There's a separate purchase and sale of the fuel, and that is critical for purposes of defeating Radcliffe's lien because simply they didn't take the order on the order of the owner or party authorized to buy in the vessel. And to Judge May's point earlier, it absolutely was intentional that this contractual relationship was set up this way. Technique UK, the owner of is a British company, a United Kingdom company, and they also wanted to do business with OW UK, also an English company. And they set it up that way so that they could strip the chief engineer on the vessel with the authority to go make these purchases because the procurement for fuel was housed in a central office for Technique's operations worldwide. It was done intentionally and segregated the way that it was so as to avoid the precise problem that we're dealing with here. I think it's important to note also that even though they're from other circuits, every other district court to decide the issues before this panel, granted at the district court level, have all found, except for one, that there is no maritime lien for a physical supplier like Radcliffe. And I think that's telling. And I think that if you look at what the district court judge did here, he relied on the O'Rourke opinion with respect to the proper test, and it was absolutely correct. Mr. Paulson went through the difference between the agency line of cases, the middleman case, versus the general contractor subcontractor. And unfortunately for Radcliffe, they're unable to establish that they fall in the agency line, and they can't show that they meet the general subcontractor line of cases, which rarely grant a lien in any event. And so unfortunately, they were left without a remedy. If you look at, at least as it relates to the vessel, what they do have is they have a remedy that they did not seek to recover on, which is against their contractual counterparty, OWUSA. They haven't made that claim in bankruptcy. I think it's important to note just generally speaking, if the panel were to adopt or look into the totality of circumstances argument, the result would be that you could have multiple liens for a single debt, a single fuel stem, which is unsupported by any legal precedent, and contrary to the policy of maritime liens, which are granted solely for the purpose of securing a claim under the limited auspices of the statute, not so that whenever a physical supplier or any other contractor provides something to a vessel that they automatically have a lien. So with that, I will let Mr. Fontenot respond unless there are any questions. We have none, thank you. Your Honor, if this court is to say that Lake Charles is going to control the outcome whether it's a subcontractor, which I don't think it should since it's Fifth Circuit precedent, well-developed precedent circuit, I would point out that the standard under Lake Charles is whether or not the owner selected or controlled the performance of the subcontractor. Judge Cassie skipped over the controlling performance aspect. Here, every aspect of the fueling of this vessel occurred with the involvement of TECNIP. The ODB bunkers had zero involvement. They never showed up. They never participated in their fuel, their men, nothing. Everything was between Radcliffe supplying everything and TECNIP. They want to call it post-logistic sales, but it's way more involved than that. We can't fuel this vessel without their involvement. This fueling was delayed three times. We had to take our fuel vessel to their facility, lay out about a quarter mile of containment boom, and spent 13 hours fueling this vessel. They sampled, approved, signed a bunker certificate. So, they were involved in every aspect of the performance of this fueling. It's under Lake Charles, if Lake Charles becomes the law of the circuit. I would point out that if this court agrees it's not the law of the circuit, and Galehead, and Marines Fuel, and Stevens is that we meet all those criteria. I don't know if I can ask for remand to have the judge determine whether we meet that, but we clearly meet those standards. I would like to lastly point out this strict jury. That doesn't apply to what they say it applies to whether you're going to send it to a new class or new service. Here, it doesn't control the mechanics of how this lien occurs, which is what has happened. The mechanics are saying, well, we're not going to extend it on the order, but we're going to extend it to the providing element, which I've already addressed that, I think, pretty well, and I've gone past my time. Thank you, counsel. We'll take that case under submission and move now to the third case, Calwood v. Jones. Thank you.